Good morning, ladies and gentlemen. We have three argued cases before the court this morning, all on decisions relating to patent matters and all as appeals from decisions of the Patent Trial and Appeal Board. The first case before the court is Case No. 161895, Autoliv ASP v. Hyundai Mobis. It's my understanding, Mr. Archie, that you want three minutes for rebuttal, is that correct? That's correct. Okay. Oh, it's ACKEY. ACKEY. ACKEY. All right.  No R. All right. You may begin. Thank you, Your Honor. Your Honors, may it please the Court, my name is Wes Ackey, and I represent Appellant Autoliv ASP, Inc. With me is my colleague, Keith Broyles. He will be arguing the subsequent 1896 appeal. At issue on this appeal, as well as the 1896, are patents directed to airbags, a highly sophisticated and complex technology. Hopefully no one on this panel has been in a car accident and seen firsthand how airbags operate, but if you have, you will appreciate the speed in which airbags deploy. As the experts in the IPR testified, airbags reach full deployment in a period of approximately 30 milliseconds, which, as one of the experts noted, is less than the blink of an eye. Because of the speed in which airbags deploy, a host of design considerations must be taken into account. In the blue brief at 24, you say Ms. Balovich even admitted that Tajima's fixed vents do not vent during obstructed deployment. In support of that, you cited JA 1444-46. When I looked at that, it appeared to me that she only said, and I'm quoting this, it could be possible at 1445. I didn't find anything where she explicitly admitted that. Do you have anything in the record where she does? I think the record site that you identified is the evidence on that. Well, that's not an explicit admission. She says it could be. Could not be. That the fixed vent will not work with obstruction in Tajima? She says, you say she admitted that Tajima's fixed vents do not vent during obstructed deployment. I think in the context of that deposition, she was acknowledging that the teaching of Tajima stated that in some circumstances, the fixed vents would not function when they encountered an obstruction. Back to the problem of the 653 patent. One of the things I have a problem with is that it seems like we're not really differentiating between these various claims. In other words, you're debating the temporary releasable feature and you or the temporary holding feature, and yet the description of that feature in Claim 1 and Claim 28 is different than the description of that feature in Claim 20. Am I right on that? Yes. Claim 20 specifies the type of releasable temporary holding fixture to be stitching. Whereas the other independent claims do not specify stitching, they're broader. That would mean that the dependent claims that follow from Claim 20 would also have to be narrow, correct? That's correct. Yet you seem to be buying into this notion that this broader construction is acceptable as a representative, but it doesn't seem to me that it is. I would agree with you that it's not representative of all the claims. I would say that it's representative of the broader construction being representative of Claims 1 and 35, but not Claims 20 and the dependent claims that specify tack stitching or stitching. Did you argue that separately? No, I think we were focused on the independent claims that do not specify as tack stitching. So you didn't argue to save the stitching claims even if you lose on the other claims? No, that's not the case, Your Honor. Our position with the releasable temporary holding feature is that none of the prior order of record... Right, right. I get that, but it seems like there's some distinction in the claims between some that use a broader language and some that actually require stitching. I didn't remember reading in the blue brief that you made any distinction between the two. It seems like you're making one overall argument. I think that's correct, Your Honor, yes. So if we disagree with you on the proper construction and think the board was right, is there any reason for us to sua sponte look at this narrower claim? No, I think they all rise and fall together. The stitching is clearly in the prior art, so if the argument regarding whether that stitching could apply to the cushion membrane as required by the claims, if that doesn't carry the day, then I think all the releasable temporary holding features rise and fall together. So we've touched on the fixed vent and the releasable temporary holding features. I would like to now talk about the diffuser limitation. The diffuser limitation is recited in independent claim 35 as well as dependent claims 26 and 33. The claims of the 653 patent don't just say diffuser. They recited diffuser that is configured to provide a specific function. More specifically, those claims recited diffuser that is configured to redirect inflation gas to a closed... Isn't your problem on diffuser that the PTAB considered, they said, considered these arguments in supporting expert testimony and determined they were unpersuasive? So really, you're asking us to re-weigh the evidence. I don't think it's a re-weighing of the evidence because I think if Your Honors look at the diffuser, which for Mobus' expert comes in appendix site 756, you will see, well, there's a couple of problems. First, there's no clear motivation to combine at all. In fact, if you look at appendix 756, you will see that the entirety of the motivation to combine evidence is a single paragraph from Mobus' expert that says, you would combine Tejima with a new Wallanen and Penisham, quote, based on the similarities between those airbag modules and because Tejima, quote, would improve the airbag module. That's it. That they are similar and one would improve the other. There's no further explanations provided. So we believe this fact pattern is very analogous to the obvious analysis that was vacated a couple of weeks ago by this court in personal web technologies. In that opinion, the court held that it was not enough to simply say that a skilled artisan once presented with two references would have understood that they could be combined. More analysis from the PTAB is needed, i.e. Wait a minute. I mean, is that case? I'm sorry. I don't actually remember the details of that case, but it sounds like from what you're reading to me that our criticism there was that PTAB made that conclusion, but here there's an expert saying that that's enough. Isn't that different? Isn't that expert testimony that the board can rely on? And if it is, somewhat cursory. There may be a slight distinction there, but I think at the end of the day, there has to be some evidence of an actual motivation to combine. Why isn't expert testimony that a skilled artisan would do this because of the similarities sufficient? We just don't think that that rises to the level of a sufficient motivation to combine. Simply saying that airbags are similar. You argue that Seymour doesn't provide a motivation because, quote, Seymour, this is at 38, Seymour's airbag housing or envelope is directed to a wholly separate purpose, airbag storage. Do you have any authority supporting the proposition that a person of skill couldn't be motivated to combine references solely because of a reference's purpose? No, Your Honor, not off the top of my head. I think Seymour is in reference to the releasable temporary holding feature limitation. In that situation, what the PTAB has done is take the stitching in a fabric envelope, which is not associated with the airbag module, and suggest that the use of stitching in that context would somehow motivate one of skill in the art to change these tack stitching from walnut and pinichon. A, there's no evidence in the record at all from Mobus' expert that one would do that. This is something that the PTAB came up on its own. The Mobus' expert did not even discuss Seymour. That evidence weighed with the auto lead expert made it very clear that one of skill in the art would not look to something like a fabric envelope in Seymour and somehow be motivated to combine the tack stitching from walnut and pinichon to meet the claim language. Again, do you have authority for that proposition? That purpose matters? Your Honor, I can't think of a case off the top of my head, but I will think about it while if I want to follow up. That's good. I'm going to touch back on the diffuser limitation backing claims 35, 26, and 33. Again, a review of the factual record shows that substantial evidence does not exist to support the board's obviousness finding with respect to the diffuser limitation. First, combining the diffuser of Tejima with the airbags of a new pinichon or walnut does not result in an airbag that satisfies the diffuser limitation of the 653 patent. Every figure of the 653 patent, including figure one, which is shown in appendix 48, illustrates how the diffuser is configured such that the side openings are designed to redirect the gas to the closable vents located on the sides of the airbag cushion so that the gas can rapidly exit as required by the claims. The diffuser of the 653 patent is further equipped with a hole on top of the diffuser labeled 134. That hole is important because it allows the front of the airbag to propel forward so that the air is capable of fully inflating when there is no obstruction encountered. In Tejima, however, the diffuser openings are directed to the sidewalls of the airbag and the closable vent is located above the rectifying frame. So are you arguing that the PTAB's constructions of diffuser are unreasonably broad? No, your honor. The argument is that the PTAB did not account for the full scope of the claims. I guess that is another way of saying they're too broad. They simply were reading it as a diffuser in general without looking at the follow on language which requires that the diffuser direct the gas to the closable vents such that it can rapidly exit. You are correct, your honor. I think it's an overly broad interpretation of diffuser. Is the diffuser in your invention different in physical structure than the diffuser in Tejima? Absolutely. That's a good question. The diffuser in Tejima is simply a rectifying fabric. It's simply a looped over fabric that has openings only on the sides. Those sides are only directed towards the side of the airbags. Our diffuser, the diffuser claimed in the 653 and illustrated in the 653, if you look at figure one on appendix 48, you'll notice that in addition to the side openings, which are directed towards the closable vents, it also has an opening on top. That opening on top is what allows the front of the bag to propel forward so that if there's no obstruction- But yours is made of, structured, or fashioned in the same way with some kind of cloth or something like that? That's generally how it's done, yes. They're similar except yours has an opening on top instead of just to the sides. That's one aspect, that it has an opening on top, and then the other aspect is where the side openings of the diffuser are directed. In Tejima- Sure, I get that. It's clear that Tejima doesn't have the exact same structure as yours, otherwise we'd be talking about anticipation. But the real question is, can we overturn the board's finding that a person of ordinary skill would have looked at the diffuser in Tejima and the other references and redid it so that it sent the air directly to the side vents quickly? I think, first, there's no evidence to suggest that they would change the side vents so that it's directed there. But even if they did, it would still not meet the full scope of the claim language. Because what you'd have is a diffuser, if you took the Tejima diffuser and inserted it into some of the other airbags and altered the vents such that the side openings directed the gas to those vents, you'd be left with a situation where the bag would never inflate. Because as soon as it deploys, all the air will rush immediately to the side. The inventors of the 653 patent recognize that. They recognize that you couldn't just put a diffuser like Tejima in. That's why you see the top opening in the diffuser of the 653 patent. That allows for the airbag to fully inflate when there is no obstruction, when the passenger's fully seat belt buckled in and there's no obstruction. That allows the bag to go forward and the vents to close, such that it replace. That's also an aspect of all these claims, that the airbags have to be able to fully inflate when there is no obstruction. So if you take just the diffuser in Tejima and insert it into any of the other references, you would not have a situation where you could get full inflation without obstruction. And I'm well into my rebuttal time. Yes, we'll give you two minutes for rebuttal. Okay. Mr. Hughes? Thank you, Your Honor. Paul Hughes. I represent aptly Hyundai Mobis. Your Honor, the problem of out-of-position occupants with airbags was a well-known problem and there were literally dozens of pieces of prior art that were targeted at solving this problem. The wrinkles that have been identified here were truly minor wrinkles that the board had little... Could you just get directly to the diffuser limitation? I think that's certainly the one I'm having the most difficulty with. Because it doesn't seem to me that the board properly took into account the different types of diffusers here. I know they're structurally very similar, but they seem to have very significantly different purposes. A few responses to that, Your Honor. The first, counsel was just describing a hole, for example, at the top of the diffuser. Nothing like that is claimed in the actual language of the claim itself. There's no claim that describes any diffuser with any kind of structure, nor has there been any argument by Autoliv that there's anything from the specification that would constitute any sort of limitation that should be imported or read into the claim language. So the claim itself... What about the directing language? Sorry, the directing. Well, Your Honor, the one thing I'd point the court to most clearly is that at page 226 of the appendix, this was Autoliv's own position before the board, where, again, so page 226 of the appendix, before the board, Autoliv said, quote, Tejima teaches a diffuser that directs gas the left and the right of the airbag directly towards the fixed fence as shown in annotated figure three below. This was a clear position that Autoliv took before the board. The board expressly cited this passage and relied upon this as a party admission, recognizing that the diffuser in Tejima directly pointed gas towards the side vents. Certainly, it was substantial evidence for the board to rely on Autoliv's own statements to the board as finding that that was an admission. Again, that's page 226. I think it was quite clear, and the board found that at the point that Autoliv was willing to agree with that construction of Tejima, that was very strong evidence. But Judge Hughes, returning to your point about the different kinds of structures, not only is there nothing in the claim language that would still limit, pointing the court to appendix page 58, this is the top of claim, or column four of the patent. The patent says very expressly that there is a broad array of diffusers. The patent says, quote, Note that in other embodiments, the optional diffuser may have other shapes. For example, the diffuser may be rectangular, trapezoidal, hexagonal, round, et cetera. It may also have a portion which is round or elliptical, while other portions are angled. So far from directing that there is one specific kind of structure of the diffuser, the claims are quite broad in saying that the diffuser can have any kind of shape, so long as it performs, again, according to Autoliv, the function of ensuring that enough gas rapidly exits. Now, the board, again, as I said, relied on Autoliv's own statements that the diffuser in Tejima directly points gas to the left and the right sides of the airbag, which is precisely where the fixed vents in Tejima are located. The board further looked to the evidence. This was at Tejima, paragraphs 35, 39, and 70, that the use of the diffuser in that apparatus ensured that there was sufficient venting of the inflation air, such that there was, as Tejima said, remarkably smooth deployment of the airbag in circumstances where there is an obstruction. Also, there is clear evidence of motivation to make the combination, as the court pointed out. Ms. Falovich, one of the experts, appendix page 756, gave very clear testimony as to why the combination would have been obvious, why it was an obvious improvement to take the diffuser apparatus, which was clearly disclosed in Tejima, and to use that in the Inui disclosure. Additionally, as the board noted, that the motivations of Inui and Tejima were the same, which was to ensure that there is an airbag apparatus that has sufficient venting of gas in the event of an out-of-place occupant. Both of them used various closable vents to solve that problem, but Tejima adds the additional way of solving that problem of having a diffuser to ensure that gas is properly directed. Again, the board found that one skilled in the art who was trying to solve this problem of out-of-position occupants would recognize these common solutions, and that the additional feature in Tejima, which was directed at solving that same problem, there was a motivation to combine that for use into the Inui airbag. And then finally, Dr. Helleman, Autoliv's expert, this is at page 1788 of the appendix, notes that one of ordinary skill in the art would be fully aware of the airbag's behavior in both theoretical... What did you say? 1788? Yes, your honor. Okay. Both theoretical and real-world environments, and would optimize the design for predictable, reliable, and consistent operations. The board relied on Autoliv's expert's recognition that this was fairly straightforward technology and that one would understand how the diffuser would operate in different environments and could make that with clear predictability. For all of those reasons, I think the board was well within substantial evidence of finding that there was motivation to make the combination in the particular circumstances here. And again, there's simply no specific structure of the diffuser that's claimed here. Autoliv makes clear throughout their briefs that they assert that this is a functional limitation, that it has to perform the function of rapidly exiting. The board found, as a matter of fact, that Tejima did satisfy this. They found that because the evidence in Tejima was that the diffuser would work for its purpose, which was to direct gas directly towards the vents. As I pointed out earlier, at appendix 226, Autoliv conceded before the board that that's exactly what the diffuser did, which was point gas directly at the fixed vents on the sides of the Tejima device. Let me turn you to the temporary releasable temporary holding fixture. I still have a problem between, and I understand that your friend on the other side may have given this away, but the whole debate here is whether this all has to be in the cushion membrane, right? That's right, Your Honor. For instance, claim 20, I don't know how you could read it as anything other than being in the cushion membrane. I know that stitch in and of itself might have been known in the prior art, but that stitch necessarily has to be in the cushion membrane to do exactly what the claim is saying, right? I don't think that's correct, Your Honor. And again, I do think as you identified, Autoliv identified that stitching was not something that they were separately relying on. I think they made that quite clear that their argument rests not on stitching. Well, it's kind of hard to say you're not relying on it when it's in your claim. This is not something that's just in the written description. It's expressly in the claim. And so to take a step back, the question is, as Your Honor pointed out, does the stitching have to be applied directly to the fold, or does it have to have the purpose of holding the folds in place? The board at Autoliv's own invitation interpreted the claims to be as broad as possible to hold the folds in place. In Autoliv's initial response before the board, that's appendix page 207 to 209, they say it needs its plain and ordinary meaning, which is as broad as possible. In the institution decision, the board agreed with that. Later in its response, Autoliv asserted that it's simply, quote, a feature in the airbag that's releasable and temporarily holds the fold of the airbag in place, that's at 286. The board adopted that in its institution decision in A10. Having advanced this argument throughout, I think Autoliv has both waived and has stopped from arguing a contrary interpretation at this point, which would suggest that there But they never waived the argument that no matter how broadly you interpret the feature, it still has to be in the cushion membrane, right? Well, Your Honor, I don't think they've ever made that argument as a matter of claim construction. They've articulated no reason why this court should assert that there needs to be a stitch in the fold of the claim boundary itself, and there are many other ways that one can accomplish the temporary releasable holding feature with stitching without a stitch in the fold. So for example, the Wolin device holds in place, the board identified, using breakaway tack stitching that isn't attached to the fold directly, but holds the whole device in place. Additionally, the envelope of C-more that the board discusses, it is an envelope mechanism where it is held together by a releasable seam. It's stitching across the seam that is broken when the device activates. I think what Claim 20 requires, that is stitching requires, is that the mechanism that is released at the releasable temporary holding feature is stitching. Is it held together by stitching, and when it releases, is it being released by the breaking of stitching? And that certainly... The stitch is necessarily holding the fold, right? Yes, Your Honor, it's holding the fold, but to hold the fold, the stitch doesn't have to be through the fold. That's because, for example, the C-more device has an envelope that holds the entire, the folds together, that holds the folds in place, and this is why the board's construction is so important. Right, it seems dramatically different than what we're talking about in this patent. Well, Your Honor, I think it's clear that from the specification elsewhere, that what the reason that you need this held in place is both so the airbag stays in one place and all of the parts are properly positioned during storage, cars go through lots of bumps, they might go years and years before the airbag is actually used, so you have to make sure that the various folds and the various valves are held in place and are all in position at the point when they need to be deployed, so that way the various apparatuses that are claimed can operate. And so that's the board's construction of temporary releasable holding feature, is that all of those places have to be held sufficiently in place, such that when the... Right, it seems to be taking this language completely out of the whole structure of this patent. Well, I'm not sure I see that, Your Honor. I think the board, again, this was an auto-lives interpretation, using the broadest reasonable interpretation says the temporary releasable holding feature... Okay, forget about whether or not they made the wrong argument. Let's talk about what the claims actually require. Well, I think the board was correct to say what the claims are requiring is a device that makes sure that everything is held in the right place, so that when the device is deployed... And in some fashion uses stitching. Yes, and in some fashion, the thing that's doing the holding needs to be stitching, and the thing that breaks is stitching. All of these claims, the entirety of these claims that relate to this, all are talking about something that's occurring in the cushion membrane, right? Well, they're... It's like all of a sudden, then you're moving outside of it. Well, to be clear, Your Honor, in both Wolin and Penensham, these are stitching mechanisms that are within the cushion membrane that are holding everything in place. So Penensham and Wolin both relate to things that are directly within the cushion membrane. But it's true that many of the valves in those devices are within the cushion membrane. But what's important about the releasable temporary holding feature is not whether or not it's in the cushion membrane or not, but that the things that are in the cushion membrane are being held securely in place, such that when they need to be used, they're all in the right place. The thing that does that holding and the thing that then releases, that needs to be stitching according to Claim 20. The board had a little problem finding that there was reason to find that in Wolin and Penensham, as well as in Seymour. My colleague on the other side admitted a few moments ago that the prior art is replete with stitching. That's why they've said they don't have a separate argument based on stitching, because stitching is found everywhere throughout the prior art, that it was an easy, obvious modification to make. In addition to the explicit prior art references, for example, Ms. Balavich, there's various testimony that stitching to hold folds was well-known in the art. Some examples of this are at appendix pages 746 and appendix pages 1413. Again, I think it's that recognition that stitching is so ubiquitous in the prior art is why Autoliv is making the determination not to separately rest on that stitching argument, because the prior art is so clear on that point, and the board was certainly within substantial evidence to make that determination. What do you read the language where in the court is fixedly anchored to the cushion membrane in some of the dependent claims that were also found invalid? What do you read that language to require? Your Honor, you're looking at Claim 20 here? Looking at Claim 22. But it also appears in Claim 30? Your Honor, I don't deny that other things are talking about being attached to the cushion membrane, but the claim limitation issue here, where in the releasable temporary holding feature is stitching, I think that has a much broader understanding, which is what the board found. And again, there's been no challenge to the board's claim construction. If Autoliv had wanted to challenge the claim construction that the board made, they had the opportunity to raise a claim construction, and we would have responded in kind. There's not been any challenge to the claim construction that the board found. And at the point that the claim construction has not been challenged, that's simply an argument I think that's been waived and not one that Autoliv can avail itself of, having not advanced the argument to this court and having taken the direct contrary position to the board below. Before you run out of time, can I ask you about the fixed vent issue? Yes, Your Honor. What's your support? Is Tejima the support you have for the board's substantial evidence determination, or do you have anything else? Well, Tejima is the reference on which the board relied in finding that there was a fixed vent. And about fixed vent, let me be crystal clear, I think the most important... It's not just fixed vents. It's fixed vents that vent during an obstruction. That's the issue, right? They say Tejima doesn't show them venting during an obstruction, and the board found it did. Yes, Your Honor. And most critical thing, since I'm running out of time, is the board relied on paragraph 70, which says clear as day, paragraph 70 of Tejima, that there's venting during an obstructed deployment. Can you show me where that is? Because I've read these two paragraphs a bunch of times, and there's nothing clear about either of them. I understand that, Your Honor. I mean, I know it's a translation, so that's probably part of the difficulty, but I don't read 70 and 71 together to say that it vents during an obstruction. So, Your Honor, paragraph 70 says, furthermore, in the embodiment, because the gas for use and expansion can be exhausted from protective exhaust vents 34 and 34 dispose on both the left and the right sides, which does not interfere with the windshield, and then this is where it becomes important. When there is interference with the interference object, even if the airbag expands the left and the right, because the gas for expansion is exhausted from the protective gas exhaust vents 34 and 34, the increased pressure force of the interfering object can be prevented. The protective gas exhaust vents 34 and 34 are the fixed vents. Now, 71 says that in early stage deployment, there might not be sufficient venting, but that then just turns to the claim construction argument, does there have to be continuous venting throughout? For all of the reasons we explained in our brief, there's no requirement that there needs to be continuous venting at every moment of all of those 30 or 50 microseconds or milliseconds of airbag deployment. If there's not venting in the first couple of milliseconds, but there is thereafter, it meets the claim limitation. So this is what I'm not quite sure of. Is that really what this is saying, or what if the obstruction is so far forward that it doesn't allow this to unfold at all? I can read this, or at least it seems more likely to read this as those vents never. Well, Your Honor, two things about that. First, the board, I think, was in substantial evidence to read that in a different way. Second, though, my second point is I point the court to paragraph 39, where the court talks about the expansion, and then, sorry, my final point is the board says this is not commensurate with their own claim scope. If the court, for example, looks at claims, figures three and four of their patent, figures three and four of their own patent identified their structure in which there's no venting during the early first couple of microseconds, but then there is venting at the later point as the airbag continues to expand. Because even if there's obstructed deployment at the initial point, the airbag doesn't expand forward, but it does continue expanding to the sides, which again, that's described in paragraph 39 of Tajima, and when it expands to the sides, that's what ensures that there's venting that occurs. The final point about this is paragraph 71 only says that there's a lack of a gross opening, not that there's no opening at all. All that teaches is that you need to have vents in addition to the fixed side vents, which is exactly what they themselves claim. Their fixed vents are not, they never say that they're sufficient or alone by themselves enough. They teach them in combination with other open, closable vents, which is exactly what Tajima does as well. There's just really no disconnect at all between the prior art here and what it is that their patent claims. I'd be happy to answer any other questions the court may have. Okay. Thank you. Thank you, Your Honor. Your Honors, I'd like to address the releasable temporary holding feature limitation and then another point on the diffuser. Yes, tack stitching has been used in airbags. However, not a single reference of record or any that they could find uses tack stitching or any stitching or any other type of feature to hold the folds that are actually in the cushion membrane. Claims one, claims 20, all the independent claims all require that they're directed to an airbag cushion that has a cushion membrane. The fold is held in place by the temporary releasable holding feature in that airbag cushion, not something outside like the fabric envelope of Seymour. I do believe it's a dramatic disconnect between the type of art that the board relied on to what's claimed and what's shown in the 653 patent. Again, and one other thing, with respect to the plain and ordinary meaning, we proposed a feature in the airbag as an interpretation of the plain and ordinary meaning, that it's a feature in the airbag that is releasable and temporarily holds a fold in the airbag in place. Again, we didn't waive anything. We always consistently said that these claims are about something in the actual membrane cushion itself that holds the folds together. Next, with respect to the diffuser limitation, we're not trying to read anything into the claims about the specifics of the diffuser. The claims themselves require that the airbag cushion, when there is no obstruction, the quote, without obstruction, the cord extends and at least partially closes the first and second closable vent. The full scope of the claims require that the combination would fully inflate without obstruction. That would not be possible if you were to use the type of diffuser that Tajima teaches. You simply wouldn't have all the air would rush out of the sides and you would have no way of propelling the front of the bag forward. That is clear. Mr. Hughes also made a point about how the patent specification talks about there's lots of different types of diffusers taught in the 653 patent. If you notice, all that discussion was about the type of shape, rectangular, oval, had nothing to do with the additional hole in the front to allow for the airbag to function properly when there was no obstruction encountered. I'm out of time. Thank you, Your Honor. Thank you. Did you find the authority I asked for? We did not in time. I apologize for that. Okay.